The opinion of the Court was delivered by
O’Neall, J.
The Court of Errors, having unanimously concurred in the ruling below, have instructed me to deliver *500 the opinion. I have had the benefit of twice hearing the able argument of the attorney for the Eelator; but I have never seen cause to hesitate about the judgment, which I formed on the Circuit. Bather than delay the opinion, I have thought it was better briefly to assign the reasons of our judgment. A review of the learned argument of the Eelator’s attorney would be to write a book on this subject. The work of elaboration and expansion, after twenty-eight years service on the Bench, may well be left to younger and more ambitious men. A right decision is more to be desired than many reasons. It is often, that in the multitude of words error is found. There was an old aphorism that wisdom was shown by few words: and beyond all doubt, if there is any thing which is becoming a more serious evil than any other-both in making and expounding laws, it is that too much is said.
So much by way of excuse for not undertaking the immense labor of reviewing the able argument of the Eelator’s attorney.
The positions, which he assumed were, 1st, That the legislature could not constitutionally confer the power exercised by the respondents. This he supposed to be the power to construct Eailroads, in or out of the State, and to tax the people of the city to pay for them. But I do not so understand the power exercised. I regard it as the mere investment of the funds of the corporation in stocks. They (the corporation) subscribe so much to the stock of a Eailroad Company. What is that but buying so much stock in it. If the corporation had an excess of funds and could pay each instalment without taxation, no one would doubt their power thus to dispose of their surplus funds. What is the difference between that case and borrowing money by the sale of their own bonds to pay for the stocks ? It may not be wise thus to go into debt, but I do not perceive how the Mayor and *501 Aldermen are to be checked, in the exercise of this power, save by the ballot-box.
I know no restrictions on legislative power, wbicb in this State is vested by the Constitution in the General Assembly, except those which deny certain powers, or which by implication arise because certain powers are conferred on Congress. So far as legislative power is concerned, I agree, that subject to the restrictions, which I have suggested, the General Assembly have all the powers of the Parliament of Great Britain. But I do not believe that the judicial or executive powers belong at all to the legislature. The Constitution has wisely placed these in different. hands. That the General Assembly have all the powers, which the respondents have exercised in their corporation in and for the whole State, I have no doubt. If they (the General Assembly) thought proper, they could build a railroad, with just as much propriety as a Granite State House. Both might lead to an extravagant waste of money, but still the power can not be questioned. They have dug canals, and built roads, and I have no doubt they will do so again. They have subscribed to railroads in and without the State, and it is very possible, they may do so again. For all these purposes, they have directed bonds to be issued and sold, and for their payment have taxed the property of the State. The powers of the General Assembly in all these respects seem to me to be undoubted, and if so, why may they not clothe a municipal corporation with the same powers to be exercised for the benefit of the people of their charge ? It seems to me to be clear they can.
2d. If so, the next question is, did the legislature in the charter of the city use words sufficiently large to cover the power exercised by the City Council of subscribing to railroads, issuing bonds to be sold for the purpose of paying for the same, and then taxing their corporation for the final payment of the bonds thus issued and sold. After *502 specific powers are given, tbe Council are authorized to make every “ other by-law or regulation that shall appear to them requisite and necessary for the security, welfare and conve-niency of the said city or for preserving peace, order and good government for the same.”
It is true that railroads were not in 1783, even thought about, but because the subject of action is new, it by no means follows, it may not be within the words conferring the power. A penitentiary did not exist at the formation of our Constitution, yet who doubts, that the General Assembly may establish one.
The only enquiry legitimate and proper is whether a subscription to a railroad in the State or without the State may not be necessary for the “ welfare or conveniency of the cityV Who is to decide that question. The Court ? Certainly not. It is by the words of the charter left to the City Council. But let us examine the matter slightly. Charleston in 1783 was looked to as a commercial city. She had realized the importance of commerce in a very striking degree between 1776 and 1783. Before war in reality brooded over her very hearthstones, from 1776 to 1780, her merchants became indeed princes, but from the fall of the city in May 1780 to 1783, she became a garrison town, and saw wealth and commercial enterprise take to themselves wings and flee away. It was therefore of great importance to promote the means and channels of commerce. That from that day to this has been a prime consideration. Why was the Hamburg Eail-road conceived and begun ? Was it not to promote the commerce and convenience of the city? Why was the Louisville, Cincinnati, and Charleston Eailroad projected? Was it not to connect the queen cities of the west and south ? Why have all the railroads, in the State and out of the State; to which Charleston has contributed, been built ? Certainly presently or remotely to benefit Charleston. Have they not answered the ends intended ? I have no hesitation in saying *503 that though it is probable, there have been instances in wbicb little has been done, where much was expected, for the benefit of the city, that yet in the main they have contributed much to the “ welfare and convenience/" of the city. Go back to the period when the Charleston and Hamburg Road was contemplated; when its noble founders Black, Áiken, and others, calculated its income, as a paying concern from the daily travel of five or six passengers in the mail coaches of that time, and compare it with its present annual income of more than a million and a half, and ask has it not contributed to the 11 welfare and conveniency" of the city? How has it been enabled to do this ? Is it not by its connection with the roads within and without the State which have been helped to be built by the generous contributions of the city ? So it seems to me. Considered in this way, I have therefore no doubt about the powers exercised. But really there is no necessity for such an argument. What is a corporation ? It is an artificial person, capable not only of exercising given powers, but also of owning real and personal property. Suppose the city of Charleston was as fortunate as Augusta; and had like her a large fund derived from a very productive piece of property, might not her City Council invest this fund in the purchase of stocks, or in subscribing to a Railroad ? I see nothing to prevent such a course. Why not, in the absence of funds, become the owner of railroad stocks by borrowing money, making and selling bonds, and trusting to the fortunate result of the investments to pay for them, or, that expectation failing, to charge the payment on the future means of the city. I am unable to see anything to restrain the city authorities in this respect, but public opinion, indicated by the ballot-box. The taxing power given by the charter “to make such assessments on the inhabitants of Charleston, or those, who hold taxable property within the same, for the safety, convenience, benefit and advantage of the said city, as shall appear to them expedient,” is ample. They *504 can make just snob assessments as may in their judgment be necessary. I do not perceive any thing which can help the Relator, Copes, from paying, as long as he may own property within the city, its due proportion of the city debt in the shape of assessments.
3d. Bufrif the power of the City Council was doubtful, by the Act of 1854 the General Assembly have confirmed the action of the City Council. That is to my mind a conclusive answer to all which has been said. The proceeding by quo war-ranto is a remedy, in the name of the State, for the exercises of a power on the part of a corporation, which has not been granted to it, and thereby the charter may be forfeited. The State, however, before the proceeding by quo warranto says, if you had not the authority, we now confirm all which you have done. This relates back, and by confirming, necessarily gives the challenged power, at the time it was exercised. How can she afterwards ask, by what warrant did you exercise the power ? She is estopped, and of course the Relator.
But it is contended, this was also an unconstitutional Act. It has been well asked, by what provision of the Constitution ? None can be found. The whole argument is by mistake. This is not charging Mr. Copes with a debt. It is not infringing upon any of his rights. It was exclusively a matter between the State and the city. Each represented by their constituted authorities have concurred in the Act of 1854, and there is an end of the whole matter.
The motion is dismissed.
JOHNSTON, Dunkin, Dargan and Wardlaw, CO., and WITHERS and Whitner, JJ., concurred.
Munro, J,, having been of counsel gave no opinion.

Motion dismissed.